THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
GEORGE E. TIBBS, Defendant-Appellant.

Fifth District   No. 76-291

Opinion filed February 15, 1978.

JONES, J., dissenting.

Dixon, Starnes, Nester & McDonnell, of Belleville, for appellant.

Howard L. Hood, State's Attorney, of Murphysboro (Bruce D. Irish and Keith P. Vanden Dooren, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE GEORGE J. MORAN delivered the opinion of the court:

Defendant appeals from a judgment entered by the trial court of Jackson County after a jury found him guilty of the crime of voluntary manslaughter.

The defendant and one Charles Compton were jointly indicted for the murder of Marion Lipe. The indictment read as follows:

> "That on May 1, 1975, in Jackson County, George E. Tibbs and Charles Compton committed the offense of murder in that they did without legal justification strike Marion Lipe about the head with a metal carpenter's level and kick Marion about the head and chest with their feet, knowing such acts created a strong probability of death or great bodily harm to Marion Lipe, thereby causing the death of Marion Lipe. In violation of Paragraph 9—1(a)(2), Chapter 38, Illinois Revised Statutes."

George Tibbs, Charles Compton, the deceased Marion Lipe, and several other people were in Big John's Tavern in Murphysboro, Illinois on May 1, 1975. The evidence disclosed that Lipe had gone with Tibbs's wife before she and Tibbs were married. Tibbs was standing at the bar when his wife came in to talk with him, whereupon Lipe came over and grabbed her by the arm. She broke loose from Lipe and ran outside. Meanwhile, Lipe took a swing at Tibbs who ducked and they both then wrestled each other to the floor. The fight was broken up and Tibbs went outside followed by Lipe. The fight between them continued outside with Lipe, who was younger and stronger than Tibbs, getting the better of Tibbs until Tibbs's friend, Charles Compton, hit Lipe in the head with his fist. Glenn "Pistol" Stearns then started to help his friend Lipe, when he in turn was hit in the head with a pool cue by Bill Tibbs, the younger brother of the defendant. About this time a general fight with several participants broke loose. As a result Lipe was killed, Glenn "Pistol" Stearns was badly injured and George Tibbs's left arm and chest were injured. Broken pool cues were found lying all over the parking lot of Big John's Tavern after this brawl. The trial court directed a verdict in favor of Compton at the end of the State's evidence. It also denied defendant Tibbs's motion for a directed verdict and then denied Tibbs's motion for a mistrial which was based on the claimed prejudicial effect of dismissing Compton out of the case at that time.

Delbert Dusch, the first witness called by the State, testified that he arrived at the tavern around 7 p.m. with his wife. There were whispers of trouble. About 8 p.m. Tibbs's wife came in the tavern and talked to her

husband who was at the bar. When she started to leave, Lipe grabbed her and Tibbs told Lipe to take his hands off his wife. Lipe told him he had known "this girl" for a long time and he did not have to let her go. Tibbs's wife broke loose and ran outside. Lipe took a swing at Tibbs. Tibbs ducked and they wrestled each other to the floor. Tibbs then went outside followed by Lipe. The fight continued outside with Lipe, who was younger and bigger than Tibbs, getting the better of it. Someone then hollered that "Dudy" (Tibbs's wife) had a wreck. Dusch went back into the tavern to get his wife to take care of her. When he came back, he saw Lipe with a pool stick, or a piece of one, swinging at Tibbs and Tibbs had his arm up protecting his head. After the ambulance came and got Tibbs's wife, he walked back to the scene of the fight and saw Lipe laying with his head on Jackie Stearns' lap and "Pistol" Stearns sitting with his head bleeding.

Charles Yearian testified that he arrived in the tavern about 7 or 7:30 p.m. on May 1, 1975. He saw the scuffle inside the bar and the fight outside. Both men were swinging at each other. He thought the fight was over and went back into the tavern. He went out again to the back door and saw Lipe and Tibbs wrestling. Then Compton struck Lipe with his fist. After that, Compton backed away from the fight and Lipe and Tibbs kept fighting. He went back into the tavern again, stayed for about a minute, and when he came out, he saw some other people with cue sticks. He saw Glenn Stearns sitting in the back doorway. Bill Tibbs was hitting him in the head with a cue stick. Marion Lipe was standing looking at Glenn Stearns and George Tibbs was standing beside or behind him with a carpenter's level in his hand, which someone had gotten out of the truck for him. He then saw Tibbs hit Lipe in the head with the level, but he did not know for sure whether it was with the sharp side or the flat side. He did not see Lipe fall after he was hit. He also said that Stearns told him that Lipe had told him earlier that he wanted to fight.

Charles McComb testified that he owned Big John's Tavern. Lipe and Tibbs had been arguing about something and they finally got into it. They broke up the fight in the tavern and the two of them then went outside. When McComb saw Stearns coming in the back door with his head all bloody, he went outside to see what was going on. He then saw Tibbs hit Stearns with a level across the back. Lipe was laying on his back on the ground. Tibbs had a level in his hand which he put in the tool box in his truck. He did not see Compton there at the time.

Robert Dale Wright testified that he was in the tavern that night accompanied by Susie Klump. He saw the fight in the tavern and helped break it up. Lipe and Tibbs then went outside. He stayed inside the tavern for a while and then went out as far as the back door where he could see about ten people fighting, but he did not see either Tibbs or Compton at

that time. He went back out and saw Tibbs and two other men fighting. He saw Charles Compton throw a soda bottle toward a fight that was going on on the Eleventh Street side of the building. He went back into the tavern again and when he came out he saw Lipe on the ground. One of the police officers was there. He then saw Compton jump behind the police officers and kick at Lipe. He thought the kick landed on Lipe's upper body.

Deborah Glassford testified that she went to Big John's Tavern around 7:30 p.m. that night. There was a fight going on outside at that time. She saw Marion Lipe, George Tibbs, Charlie Compton, and a few others walking back toward the tavern. Lipe was walking close to the building and Tibbs was farther away from it. George Tibbs got a level and struck Marion in the back of the head with it. She did not see where the level came from. Tibbs swung the level like a ball bat several times. She then saw Tibbs kick him in his side area and chest. She also saw Compton kicking at someone, but it was not Lipe.

On cross-examination she said she stayed in the tavern for about five minutes. She went to the back door where the parking lot was and no one was there. She stepped out the back door onto the parking lot, turned to her right and walked back to Eleventh Street. She then saw all the people that she had seen before. All of these people came back around the corner to the parking lot. Tibbs and Compton came around from the Eleventh Street side of the building first with Lipe following them.

Howard Arbeiter testified that he was standing in the area of Big John's Tavern on the night in question. He saw Tibbs who he did not know at the time stomping the head of a man lying on the ground. He said Tibbs stomped him for 10 or 15 minutes.

On cross-examination the following occurred:

"Q. Did you make this statement, 'I don't know what he had but they both had a stick, but then they broke up pretty quick. They never done much fighting.'?

A. Did I answer that?

Q. Did you give that statement?

A. Yes.

Q. You did give that statement?

A. Yes."

Jerry Goforth, a Murphysboro police officer, was called to the accident where Tibbs's wife had backed her car into a liquor store building. Mrs. Tibbs was semiconscious so an ambulance was called. They were then informed that a fight had started at Big John's. Big John's and the liquor store are separated by Twelfth Street and the parking lot area behind Big John's. He and Officer Glodo started toward Big John's when they saw Tibbs strike Lipe twice on the right side of the head with a carpenter's

level, swung like a baseball bat. Lipe appeared to be turning away at the time. By the time they got there, Tibbs had thrown the level into the back end of his truck. They took a number of pieces of pool cue and a carpenter's level from where the fight took place. After they arrived at the scene, all the other physical activity had ceased.

Kendall Glodo, another Murphysboro police officer, was with Officer Goforth. He testified that Big John's Tavern was about 40 yards from where they were. He saw Bill Tibbs hitting someone with a pool cue. He also saw Tibbs hit Lipe with something that appeared to be a 2 x 4 in the back of the head. He did not see Compton there.

On May 5, 1975, Dr. John Thomas a coroner's physician in St. Louis, Missouri, conducted an autopsy on the deceased's body and concluded that the cause of death was traumatic intercranial hemorrhaging and a fractured skull that could have resulted from a fall or blow. He further testified that he found hemorrhage in the left as well as the right hemisphere of the brain.

The State also produced two medical doctors, Dr. Masood Akhtar, the treating physician, and Dr. John Thomas, who performed the autopsy on Lipe's body. Dr. Akhtar testfied that upon examining Lipe the evening of May 1, 1975, he noticed "many areas of swelling and bleeding, on the scalp and face area." It was Dr. Akhtar's opinion that Lipe had suffered severe brain damage. Lipe, upon Dr. Akhtar's recommendation, was transferred to Barnes Hospital in St. Louis at 9:50 p.m. that same evening. He died some time later.

The carpenter's level and Tibbs's boots that had been taken from him at the jail were introduced into evidence over the objection of the defendant. Expert testimony established that there was human blood on both boots and the carpenter's level. This completed the evidence offered by the State.

Tibbs testified that Lipe had threatened him repeatedly earlier in the evening. His wife came in about 8 p.m. and sat at the bar with him. When she started to leave the bar, Lipe grabbed her by the arm and said, "Dudy." She jerked away from him and went out the back door. He told Lipe to keep his hands off his wife and Lipe yelled some obscenities at him. Lipe approached him with a pool cue in his hand and said he was going to "stomp his ass." They wrestled and then someone hollered that Tibbs's wife had been in an accident. He broke loose and went out the back door. Lipe followed him out and hit him with a pool cue. Warding off the blows with his arms, Tibbs reached his pick-up truck and got his carpenter's level. He swung once at Lipe and swung again, but did not know where the blow landed.

The earlier threats by Lipe to Tibbs were substantiated by Kenneth Fulkerson. Fulkerson, Cecil Compton, Charles Compton, and Claudia

Tibbs all testified that Lipe grabbed Mrs. Tibbs and refused to release her upon defendant Tibbs's objection. Charles Compton testified that Lipe had a pool cue and was hitting Tibbs and that Tibbs struck Lipe in the legs and head with a metal carpenter's level after reaching his pick-up truck.

James Popejoy, a 17-year-old high school student, testified that a few days after the incident he and another boy were in a church bus when Deborah Glassford said that she was going to see that "Tibbs and Compton hung for what they did to Lipe" even if she had to lie about it.

At the close of the State's case, defendant Compton's motion for a directed verdict was allowed by the court over the prosecution's strenuous objection. At the same time the defendant Tibbs made a motion for a mistrial on the basis of the court's direction of a verdict in favor of Charles Compton. In support of this motion defense counsel argued that the defenses of the co-defendants had been antagonistic from the beginning, that the court's refusal to sever the trial had been error, that much of the State's evidence theretofore heard by the jury tended to establish Compton's guilt, and that under such circumstances granting a directed verdict for Compton amounted to an instruction that Tibbs was guilty as charged. We agree that defendant Tibbs should have been granted a mistrial.

It is generally accepted that in moving for directed acquittal the accused admits the truth of the facts stated in the prosecution's evidence. (23A C.J.S. Criminal Law §1145(3)(h) (1961).) Thus, the substance of an accused's motion is that the evidence is insufficient as a matter of law to support a verdict of guilty. In this regard the ABA Minimum Standards for Criminal Justice provide:

> "After the evidence on either side is closed, the court on motion of a defendant or on its own motion shall order the entry of a judgment of acquittal of one or more offenses charged if the evidence is insufficient to sustain a conviction of such offense or offenses." ABA Standards, Trial by Jury §4.5(a) (1968).

■■ Illinois law specifies that in ruling upon such a motion it is incumbent upon the trial court to consider all of the State's evidence. As stated in *People v. Tatum*, 77 Ill. App. 2d 178, 181-82, 222 N.E.2d 177:

> "It is hornbook law in Illinois that upon a motion for a directed verdict, the trial judge must construe the evidence most strongly in favor of the party against whom the motion is directed, and where there is evidence which either supports his side of the case or upon which reasonable minds might reach different conclusions the motion must be denied."

Inherent in such cases must be an appreciation for the respective functions of the judge and jury. The resolution of conflicting evidence or

of the various inferences which may be drawn from the evidence is within the province of the jury. Likewise, the assessment of the witnesses' credibility is a task for the jury. The function of the judge in ruling on motions for a directed verdict was succinctly expressed by the Sixth Circuit:

> "In testing the sufficiency of the evidence to withstand a motion for judgment of acquittal, the trial judge does not pass upon the credibility of the witnesses or the weight of the evidence. On the contrary, he must view the evidence and the inferences that may justifiably be drawn therefrom in the light most favorable to the Government. [Citations.] If, under such view of the evidence he concludes that a reasonable mind might fairly conclude guilt beyond a reasonable doubt, the motion should be overruled and the issue left to the jury. It is only where under such view of the evidence he concludes there must be such a doubt in a reasonable mind, should the motion be granted. [Citations.]" *United States v. Conti*, 339 F.2d 10, 13 (6th Cir. 1964).

In *Gott v. People*, 187 Ill. 249, 58 N.E. 293, the supreme court upheld a denial of a directed acquittal where the evidence, entirely circumstantial, was in conflict. The supreme court acknowledged that in such situations the determination must be reserved for the jury.

At the close of the State's case there was evidence from which the jury could have returned a verdict finding Compton guilty and Tibbs not guilty, Tibbs guilty and Compton not guilty, both of them guilty or both of them not guilty. There was evidence from which the jury could have found that Lipe met his death by being hit with the carpenter's level or by being kicked in the head or by both. If the jury believed that Lipe met his death by being kicked in the head and not by being hit with the carpenter's level, it could reasonably have found that Compton and not Tibbs did the kicking and could therefore have found Compton guilty and Tibbs not guilty.

Glenn Stearns, Jackie Stearns, Robert Dale Wright, Deborah Glassford and Howard Arbeiter were the only State witnesses who testified concerning the kicking. Glenn and Jackie Stearns were sure that Compton kicked Lipe but not sure that Tibbs did. Wright saw Compton jump behind a police officer and kick at Lipe's upper body. Deborah Glassford said she saw Tibbs kick Lipe in the side and chest. However, the jury should have disbelieved all of her testimony because it varied so much from the testimony of the other witnesses. Howard Arbeiter's testimony was also completely unworthy of belief. In fact, the trial judge when considering the motion for a directed verdict in favor of Compton said, "Howard Arbeiter, God knows what Howard Arbeiter saw."

During arguments of counsel, the following remarks were made:

"Mr. Rippe: Your Honor, the People feel that there has been sufficient testimony and evidence presented to connect the defendant Charles Compton with the death of Marion Lipe in this case. There has been so far presented for the People three witnesses who saw the defendant Compton either kick Marion Lipe with his feet or hit him with his fist.

Court: And there were nine witnesses for the State, Mr. Rippe, who said Mr. Compton was not there. There were nine eyewitnesses who said Compton was not there.

\* \* \*

The facts in this case are that there were twelve alleged eyewitnesses, and the court is not going into the credibility of *most* of them at this point, including two police officers who saw the *main* part of the action, which resulted apparently in the death of an individual. Certainly from the standpoint of the court at this stage of the proceedings they must be considered as impartial witnesses, and witnesses for the State." (Emphasis added.)

It is apparent that in this case the judge not only weighed the evidence but necessarily assessed the credibility of the witnesses as well. In doing so the judge disregarded the testimony of several eyewitnesses. Such evidence simply cannot be ignored. Nor can it be outweighed by the sheer number of witnesses who stated they did not see Compton in the area. While not dispositive we note the court's dicta in *People v. Wright,* 32 Ill. App. 3d 736, 746, 336 N.E.2d 18, where it was stated that "the testimony of four eyewitnesses, as in this record, is sufficient to withstand a motion for a directed verdict at the close of the State's case." Furthermore, the court admittedly gave special consideration to the testimony of the police officers although they witnessed the blow with the level from some distance away and acknowledged that a large crowd stood around Lipe blocking their view of what occurred immediately following the fall.

██ Because of the peculiar facts of this case, the court's erroneous direction of acquittal in favor of Compton greatly prejudiced the defendant Tibbs in his defense. The indictment charged that Tibbs and Compton were criminally responsible for the death of Marion Lipe in that they hit him in the head with a carpenter's level and kicked him in the head and chest area with their feet. At no time during the trial was there any evidence that Compton struck Lipe with a metal carpenter's level. In addition, the credible evidence was that Compton and not Tibbs kicked the deceased. Thus, directing a verdict in favor of Compton upon the evidence described above was tantamount to telling the jury that the court believed that Lipe's death was caused by the blow with the level. However, the State's medical testimony merely established that "a fall or

a blow" caused the death. It is just as plausible that the blow to which Dr. Thomas referred was a kick to the head. Certainly one blow with a metal carpenter's level to the right side of the back of the head would not produce the severe contusions about the face described in the testimony of both doctors. By directing a verdict for Compton in this case, the court effectively destroyed Tibbs's defense. In addition, it destroyed the possibility that the jury might find Compton guilty and Tibbs not guilty.

When the court allowed the motion for a directed verdict at this stage of the proceeding, defendant Compton and his lawyer left the counsel table, leaving Tibbs alone in the court room to defend himself. We can only speculate as to what effect this might have had on the jury. The jury may well have believed that the trial court in directing the verdict weighed the evidence and believed that Tibbs and not Compton was guilty. Defendant also argues that by trying Compton jointly with Tibbs the credibility of his chief witness was severely damaged. We agree that this could have been the result.

■■ Defendant also contends that the trial court erred in admitting the blood-stained boots of Tibbs into evidence because no proper foundation was laid for their admission and the evidence was without probative value. We reject the foundation argument. In our opinion, the boots should not have been admitted into evidence because this evidence lacked probative value. Before the boots were admitted, there should have been sufficient believable evidence that Tibbs kicked Lipe after he had fallen. The evidence that Tibbs kicked Lipe would have had to come from the testimony of Glassford and Arbeiter. However, in our opinion, their testimony was unworthy of belief, so the admission of the boots into evidence was reversible error.

The admission of the boots into evidence could have had a dramatic effect on the jury. Both Tibbs and Compton were wearing boots, but only Tibbs's boots were introduced into evidence. As a result, the jury could well have believed that Tibbs alone did the kicking.

We wish also to comment on the court's instruction to the jury on voluntary manslaughter. This instruction was given by the trial court. Although defense counsel conceded during the instruction conference that one *might* construe the evidence to justify conviction of involuntary manslaughter, the State objected to giving instructions on all three offenses (*i.e.,* murder, voluntary manslaughter and involuntary manslaughter). The prosecutor argued that under the circumstances, submission of both forms of manslaughter would tend only to confuse the jury. We agree, at least with regard to the instruction on involuntary manslaughter. There was absolutely no evidence of reckless conduct in this case. The obvious danger of compromise verdicts requires that courts be particularly careful to insure that an adequate basis in the evidence

exists for any instruction in a criminal case. Indeed, where evidence was insufficient to warrant a verdict on a lesser included offense, although it would have been sufficient to convict of the greater, the defendant has been released. *People v. Thompson,* 11 Ill. App. 3d 752, 297 N.E.2d 592; *Smith v. State,* 89 N.M. 770, 558 P.2d 39; *State v. Pruett,* 27 N.M. 576, 203 P. 840.

■■ The defendant also contends that there was insufficient evidence for a jury to find him guilty of voluntary manslaughter. The overwhelming weight of the evidence is that the deceased was the aggressor almost up to the time he received his fatal injuries; however, there is evidence that at the time he received his injuries he had quit the fight and that Tibbs was no longer in defense of his person when he struck decedent with the carpenter's level. Although this is a close case, in our opinion it was a question of fact for the jury as to whether or not on these facts defendant Tibbs was guilty of voluntary manslaughter.

Defendant makes several other contentions in this case which in our opinion are without merit.

For the foregoing reasons this case is remanded to the circuit court of Jackson County for a new trial.

Reversed and remanded.

CARTER, J., concurs.

Mr. JUSTICE JONES, dissenting:
I respectfully dissent.

The basis of the majority opinion seems to be that the trial court erroneously directed a verdict of acquittal as to co-defendant Compton. However, the trial court's action in that regard is not an issue in this appeal.

Following the acquittal of co-defendant Compton it remained for the jury to try defendant on the evidence presented. As the majority correctly noted, from the evidence presented it could have found the defendant either guilty or innocent. They found him guilty of voluntary manslaughter. That verdict finds ample support in the record.

It is of no consequence that co-defendant Compton and his counsel were no longer at the counsel table following the trial court's action in directing an acquittal of Compton. The case against defendant was the same and defendant's defenses remained the same.

Upon retrial of this case the same situation will be present as that with which defendant was confronted following the directed verdict of acquittal as to Compton. Neither co-defendant Compton nor his counsel will be present at the counsel table. The evidence surrounding the

fighting and the death of decedent, including Compton's participation, will be the same. Defendant will be able to show, or attempt to show, that decedent met his death by means other than by defendant's actions and blows. The jury will consider the same evidence as before.

To say that the defendant was prejudiced because co-defendant Compton was acquitted and departed during the course of the trial ascribes to the jury a Simple Simon character that is not demonstrably present in the record. They tried defendant's case in isolation and reached a result that even the majority concedes was plausible under the evidence. It is a burden upon judicial economy to retry this case.

I also disagree with the majority in regard to the admission of defendant's boots into evidence. The presence of blood on the boots was relevant and probative. Even though Compton's boots were likewise bloodstained it would not constitute error to admit only defendant's boots. Defendant had the opportunity to explain the presence of the bloodstains and to show the presence of blood on the boots of others, including those of Compton.

I would affirm.